Jan Graham (01231)
**GRAHAM LAW OFFICES**
Ambassador Plaza
150 South 600 East Suites 5A & 5B
Salt Lake City, UT  84102
Telephone: (801) 596-9199
jan@grahamlawoffices.com

Lee A. Weiss
**DREIER LLP**
499 Park Avenue
New York, New York 10022
Telephone:  (212) 328-6100
Facsimile:  (212) 328-6101
lweiss@dreierllp.com

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ASHOK KAPUR,<br>Individually and On Behalf of All Others<br>Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>USANA HEALTH SCIENCES, INC.,<br>MYRON W. WENTZ, DAVID A. WENTZ,<br>GILBERT A. FULLER<br><br>Defendants. | **CIVIL ACTION NO.**<br><br>PROPOSED CLASS ACTION<br><br>**DEMAND FOR JURY TRIAL** |

## COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff, individually and on behalf of all others similarly situated, allege the following

upon personal knowledge as to himself and his own respective acts, and as to all other matters,

based upon the investigation by plaintiff's counsel, which included, among other things, a review

of public documents, announcements made by defendants, United States Securities and

Exchange Commission ("SEC") filings, wire and press releases published by and regarding

USANA Health Sciences, Inc. ("USANA" or the "Company"), securities analyst reports about

the Company, reports by the Fraud Discovery Institute, and information readily available on the

Internet. Plaintiff believes that, after a reasonable opportunity for discovery, substantial

additional evidentiary support will exist for the allegations set forth herein.

## NATURE OF THE ACTION

1.      Plaintiff brings this action as a class action on behalf of a class of purchasers of

USANA common stock between July 18, 2006 and continuing through and including March 14,

2007 (the "Class Period"), to recover damages caused to the Class by defendants' violations of

the federal securities laws.

2.      USANA is a health sciences company that engages in the development,

manufacturing, and sale of nutritional and personal care products. USANA utilizes a direct sales

approach that attempts to bypass distributors and retailers in favor of USANA's Multi-level

marketing system ("MLM"). The MLM is a chain of vertically organized, independent

distributors referred to as "Associates." The majority of USANA's sales and profits are realized

through sales to these Associates.

3.      Throughout the Class Period, defendants issued materially false and misleading

statements regarding the sustainability of the Company's business model and its financial results.

As a result of these false statements, USANA common stock traded at artificially inflated or

distorted prices.

4.      In truth, the Company's MLM system was an unlawful, unsustainable pyramid

scheme whereby the majority of the Company's Associates were primarily selling to other

Associates, not consumers. Throughout the Class Period, the Company was experiencing an

exceedingly high Associate attrition rate which it concealed by, among other devices,

misrepresenting the average income of its Associates. The price of the Company's common

stock declined materially after the publication of a press release by the Fraud Discovery Institute

and an article in *The Wall Street Journal* concerning an investigation that had uncovered the

foregoing facts.

## JURISDICTION AND VENUE

5.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange

Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. §

240.10b-5).

6.      This Court has jurisdiction over the subject matter of this action pursuant to

Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

7.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15

U.S.C. § 78aa and 28 U.S.C. § 139 1(b), as many of the acts alleged herein, including the

preparation and dissemination of materially false and misleading information, occurred in this

District. USANA maintains its corporate headquarters in this District.

8.      In connection with the acts, conduct and other wrongs alleged in this complaint,

defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including but not limited to, the United States mails, interstate telephone communications and

the facilities of a national securities exchange.

**PARTIES**

9.      Plaintiff Ashok Kapur, as set forth in the accompanying certification which is incorporated by reference herein, transacted in USANA Securities at artificially inflated or distorted prices during the Class Period and was damaged thereby.

10.      Defendant USANA is a Utah corporation with its principal place of business located at 3838 West Parkway Blvd., Salt Lake City, Utah. At all relevant times, USANA common stock was actively traded in the NASDAQ under the symbol "USNA."

11.      Defendant Myron W. Wentz, the Company's founder, was, at all relevant times, the Company's Founder, Chairman, and Chief Executive Officer.

12.      Defendant David Wentz, the son of Myron Wentz, was, at all relevant times, the Company's President and a director, and according to the Company's website, "manages USANA's day-to-day operations."

13.      Defendant Gilbert A. Fuller was, at all relevant times, the Company's Chief Financial Officer, Chief Accounting Officer, and Executive Vice President.

14.      Defendants Myron Wentz, David Wentz, and Gilbert Fuller as identified above are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the parallel power and authority to control the contents of USANA's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their

4

positions and access to material non-public information available to them, each of these
defendants knew that the adverse facts specified herein had not been disclosed to and were being
concealed from the public, and that the positive representations which were being made were
then materially false and misleading. The Individual Defendants are liable for the false
statements pleaded herein, as those statements were each "group-published" information, the
result of the collective actions of the Individual Defendants.

### DEFENDANTS MATERIALLY FALSE AND MISLEADING STATEMENTS

15.    The Class Period begins on July 18, 2006.  On that day,  USANA issued a press
release entitled "USANA Reports 16th Consecutive Quarter of Record Net Sales; Q2 Net Sales
Reached $93.9 Million; EPS of $0.55 ($0.59 Excluding Equity-Based Compensation Expense),"
stating, in relevant part:

> Earnings from operations in the second quarter of 2006 grew 4.1%
> to $15.4 million, or 16.4% of net sales, compared with $14.7
> million, or 18.0% of net sales, in the second quarter of the prior
> year. Earnings from operations in the second quarter of 2006 were
> reduced by $1.2 million due to the required expensing of equity-
> based compensation. The company achieved net earnings in the
> second quarter of 2006 of $10.3 million, an increase of 8.4%,
> compared with net earnings of $9.5 million in the second quarter of
> the prior year. Excluding the expense of equity-based
> compensation, this increase in net earnings would have been
> 17.0%. Earnings per share in the second quarter of 2006 improved
> to $0.55 per share, an increase of 14.6%, compared with $0.48 per
> share in the second quarter of the prior year. Excluding the expense
> of equity-based compensation, this increase in earnings per share
> would have been 22.9%.
>
> *          *          *
>
> "We are pleased with our strong sales results which continue to be
> driven by our consistent growth of Active Associates," said Dave
> Wentz, president of USANA. "In North America, second quarter

> sales grew by 19%, compared with last year. We believe this
> growth in our most mature region reflects the continued interest in
> our products and the business opportunity that USANA offers its
> Associates. The engagement and effort of our Associate leaders in
> North America has been one of the driving forces behind this
> success. Additionally, interest in our low-glycemic, macro
> optimizer products remained strong and was a growth driver in the
> second quarter, as this product group reached 14.1% of product
> sales."

16.     In response to these positive statements, the price of USANA common stock

climbed over 10% from $36.25 to $39.97.

17.     On August 6, 2006, USANA filed its Quarterly Report with the SEC on Form 10-

Q for the period ended July 1, 2006, which confirmed the Company's revenue, net income, and

earnings per share figures stated in the July 18, 2006 press release. The Form 10-Q also stated,

in relevant part:

> USANA Health Sciences, Inc. develops and manufactures high-
> quality nutritional, weight management, and personal care
> products. We market our products on the basis of high levels of
> bioavailability, safety, and quality. We distribute our products
> through a network marketing system using independent
> distributors whom we refer to as "Associates." As of July 1, 2006,
> we had 142,000 active Associates worldwide. We also sell
> products directly to "Preferred Customers" who purchase products
> for personal use and are not permitted to resell or distribute the
> products. As of July 1, 2006, we had 75,000 active Preferred
> Customers worldwide. The majority of sales in the Direct Selling
> segment come from Associates. For the six months ended July 1,
> 2006, sales to Associates accounted for approximately 86% of net
> sales for the Direct Selling segment. For purposes of this report,
> we only count as active customers those Associates and Preferred
> Customers who have purchased product from USANA at any time
> during the most recent three-month period.
>
> *     *     *
>
> The increase in net sales from the Direct Selling segment in North
> America was 19.0% compared with the second quarter of 2005.

On a constant currency basis, sales in this region improved 15.8% over the same period of the prior year. The growth in this region was largely driven by strong sales in the United States, the Company's largest and most mature market, and Canada. Mexico also contributed to the increase in this region by growing 11.8% over the same period of the prior year. The overall sales increase in this region during the second quarter was driven by a 16.9% increase in the number of active Associates.

18.    The Form 10-Q for the period ended July1, 2006 also contained a Sarbanes-Oxley

certification, signed by defendants Myron Wentz and Gilbert Fuller, that stated:

I,    [Myron W. Wentz/Gilbert A. Fuller], certify that:

1.    I have reviewed this Quarterly Report on Form 10-Q of USANA Health Sciences, Inc. (the "Registrant");

2.    Based on my knowledge, this Quarterly Report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this Quarterly Report;

3.    Based on my knowledge, the financial statements, and other financial information included in this Quarterly Report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this Quarterly Report;

4.    The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Registrant and have:

a)    designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this Quarterly Report is being prepared;

b)    designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial

7

statements for external purposes in accordance with generally accepted accounting principles;

c)    evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this Quarterly Report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this Quarterly Report based on such evaluation; and

d)    disclosed in this Quarterly Report any change in the Registrant's internal control over financial reporting that occurred during the Registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

5.    The Registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the Registrant's board of directors (or persons performing the equivalent functions):

a)    all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize and report financial information; and

b)    any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal control over financial reporting.

19.    On October 17, 2006, USANA issued a press release entitled "USANA Reports Strong 15.8% Year-Over-Year Third Quarter Sales Growth," stating, in relevant part:

Earnings from operations in the third quarter of 2006 grew by 7.7% to $15.7 million, or 16.5% of net sales, compared with $14.6 million, or 17.8% of net sales, in the third quarter of the prior year. Earnings from operations in the third quarter of 2006 were reduced by $1.3 million due to the required expensing of equity-based compensation. Net earnings in the third quarter of 2006 grew by 1.8% to $10.2 million, compared with net earnings of $10.0 million in the third quarter of the prior year. Excluding the expense of equity-based compensation, this increase in net earnings would have been 10.5%. Earnings per share in the third quarter of 2006 increased by 7.8% to $0.55 per share, compared with $0.51 per share in the third quarter of the prior year. Excluding the expense of equity-based compensation, earnings per share would have been

$0.60, an increase of 17.6%.

"During the third quarter, we again achieved growth in sales, earnings, and Associates," said Dave Wentz, President of USANA. "We were pleased with the double-digit sales growth that we achieved in all of our markets, excluding Japan. We have maintained our commitment to supporting our Associates with excellent customer service, innovative business management tools, and science-based products, and we believe that this strategy will promote our growth in the future."

\*       \*       \*

Commenting on USANA's future expectations, Gilbert A. Fuller, the Company's Executive Vice President and Chief Financial Officer, said, "We expect net sales in the fourth quarter of 2006 to be in the range of $98 million to $100 million, compared with $86.9 million in the fourth quarter of last year, a growth rate of 13% to 15%. During the fourth quarter of 2006, we will be heavily promoting our featured coverage in Success from Home magazine with related contests and incentives. These promotions and incentives were introduced at our convention in mid-September and so far the feedback from our Associates has been very positive.

20.    On November 7, 2006, USANA filed its Quarterly Report with the SEC on Form 10-Q for the period ended September 30, 2006, which confirmed the Company's revenue, net income, and earnings per share figures stated in the July 18, 2006 press release. The Form 10-Q also stated, in relevant part:

The Company's operations are distinguished by regions served and method of distribution employed. Two reportable business segments are recognized by the Company: Direct Selling and Contract Manufacturing. These operating segments are evaluated regularly by management in determining the allocation of resources and in assessing the performance of the Company. Management evaluates performance based on net sales and the amount of operating income or loss. Segment profit or loss is based on profit or loss from operations before income taxes. All intercompany transactions, intercompany profit, currency gains and losses, interest income and expense, and income taxes are

excluded from the Company's determination of segment profit or loss.

*Direct Selling*

The Company's Direct Selling segment develops, manufactures, and distributes nutritional, weight management, and personal care products, and is the primary segment in which the Company operates. Products are distributed through a network marketing system using independent distributors referred to as "Associates." Products are also sold directly to "Preferred Customers," who purchase products for personal use and are not permitted to resell or distribute the products.

*       *       *

We market our products on the basis of high levels of bioavailability, safety, and quality. We distribute our products through a network marketing system using independent distributors whom we refer to as "Associates." As of September 30, 2006, we had approximately 145 thousand active Associates worldwide. We also sell products directly to "Preferred Customers," who purchase our products for personal use and are not permitted to resell or distribute the products. As of September 30, 2006, we had approximately 76 thousand active Preferred Customers worldwide. The majority of sales in the Direct Selling segment come from Associates. For the nine months ended September 30, 2006, sales to Associates accounted for approximately 86% of net sales for the Direct Selling segment. For purposes of this report, we only count as active customers those Associates and Preferred Customers who have purchased products from USANA at any time during the most recent three-month period.

*       *       *

Consolidated net sales for the quarter and nine months ended September 30, 2006 continued to improve over prior year results, increasing 15.8% for both the quarter and nine month period. Excluding the positive impact of foreign currency fluctuation, sales increased 14.7% and 14.9%, respectively, for the quarter and nine months ended September 30, 2006. Overall, sales growth can be attributed to an increase in the number of active Associates in most countries within the Direct Selling segment.

\*      \*      \*

*Associate Incentives.* Expenses related to Associate incentives are incurred only by the Direct Selling segment and represent our most significant cost as a percentage of net sales for this segment. Associate incentives increased to 41.2% of net segment sales during the third quarter of 2006, compared with 40.4% for the third quarter of 2005. This increase in Associate incentives, relative to net segment sales, can be attributed to an increase in the amounts that we paid on contests and promotions during the current quarter.

In the fourth quarter of 2006, we expect Associate incentive expense to decrease as a percentage of net segment sales by as much as 100 basis points from current quarter results. We have anticipated this decrease because we expect the relative percentage of non-commissionable sales to increase due to our promotion and sale of the *Success from Home* magazine, a non-commissionable item.

For the foreseeable future we expect Associate incentives will continue to be approximately 41% of net segment sales. As we look for ways to increase sales through Associate activity, our Associate incentives as a percentage of net segment sales may fluctuate modestly.

21.     The Form 10-Q for the period ended September 30, 2006 also contained a

Sarbanes-Oxley certification, signed by defendants Myron Wentz and Gilbert Fuller, that stated:

I,      [Myron W. Wentz/Gilbert A. Fuller], certify that:

1.      I have reviewed this Quarterly Report on Form 10-Q of USANA Health Sciences, Inc. (the "Registrant");

2.      Based on my knowledge, this Quarterly Report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this Quarterly Report;

3.      Based on my knowledge, the financial statements, and other financial information included in this Quarterly Report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this Quarterly Report;

11

4.  The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Registrant and have:

   a)  designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this Quarterly Report is being prepared;

   b)  designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c)  evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this Quarterly Report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this Quarterly Report based on such evaluation; and

   d)  disclosed in this Quarterly Report any change in the Registrant's internal control over financial reporting that occurred during the Registrant's most recent fourth fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

5.  The Registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the Registrant's board of directors (or persons performing the equivalent functions):

   a)  all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize and report financial information; and

   b)  any fraud, whether or not material, that involves management or other employees who have a significant role in the the Registrant's internal control over financial reporting.

22.     On January 10, 2007, USANA issued a press release entitled "USANA Provides

Preliminary Fourth Quarter 2006 Results Record Fourth Quarter Net Sales and EPS to Exceed

Guidance," stating, in relevant part:

> The company currently expects net sales for this period to be
> approximately $101 million, before the reclassification as
> described below. This exceeds management's prior guidance of
> $98 million to $100 million. Net sales after the reclassification are
> expected to be approximately $99.5 million, which represents the
> 18th consecutive quarter of record net sales. Earnings per share for
> the fourth quarter are expected to exceed management's previously
> announced guidance of $0.56 to $0.58. The company now
> anticipates that earnings per share will be in the range of $0.58 to
> $0.60 and are not affected by the reclassification as described
> below.
>
> *       *       *
>
> "We are pleased that we have finished out 2006 with such strong
> results, which reflect the hard work and dedication of our
> Associates as well as the market's continued enthusiasm for our
> science-based products," said Dave Wentz, president of USANA.

23.     In response to these positive statements, the price of USANA common stock

climbed almost 3% from $50.83 to $52.30.

24.     On February 6, 2007, USANA issued a press release entitled "USANA

Announces Record Fourth Quarter 2006 Financial Results," stating in relevant part:

> Earnings from operations in the fourth quarter of 2006 grew by
> 8.3% to $16.7 million, or 16.8% of net sales, compared with $15.4
> million, or 18.0% of net sales, in the fourth quarter of the prior
> year. Earnings from operations in the fourth quarter of 2006 were
> reduced by $1.3 million, due to the required expensing of equity-
> based compensation. Earnings per share in the fourth quarter of
> 2006 increased by 13.0% to $0.61 per share, compared with $0.54
> per share in the fourth quarter of the prior year. Excluding the
> expense of equity-based compensation, earnings per share in the
> fourth quarter of 2006 would have been $0.65, an increase of

20.4%, compared with the fourth quarter of the prior year. Earnings per share in the fourth quarter of 2006 were impacted by an expected unfavorable tax ruling, resulting in a tax rate that was higher than anticipated, and by a favorable foreign exchange gain on capital that was returned to the Company from one of its foreign subsidiaries.

"The fourth quarter marked the 18th consecutive quarter of record sales, driven by strong sales growth of 16.6% in North America and 19.9% in the Asia Pacific region," said Dave Wentz, President of USANA. "Our results demonstrate our ability to grow in both our mature markets and in our newer markets.

"The promotions that we offered during the fourth quarter, including those relating to Success from Home Magazine, were key elements of our strong performance in the quarter. We are optimistic that, as we continue to offer contests and promotions, we will consistently generate new Associate prospects throughout 2007."

25.     In response to these positive statements, the price of USANA common stock

climbed over 8% from $55.28 to $59.92.

26.     On March 6, 2007, USANA filed its Annual Report with the SEC on Form 10-K

for the period ended December 30, 2006 (the "2006 Form 10-K"). The Form 10-K stated, in

relevant part:

> *Network Marketing Regulation.* Laws and regulations in each country in which we operate prevent the use of deceptive or fraudulent practices that have sometimes been inappropriately associated with legitimate direct selling and network marketing activities. These laws include anti-pyramiding, securities, lottery, referral selling, anti-fraud and business opportunity statutes, regulations, and court cases. Illegal schemes, typically referred to as "pyramid," "chain distribution," or "endless chain" schemes, compensate participants primarily or solely for the introduction or enrollment of additional participants into the scheme. Often these schemes are characterized by large up-front entry or sign-up fees, over-priced products of low value, little or no emphasis on the sale or use of products, high-pressure recruiting tactics, and claims of huge and quick financial rewards requiring little or no effort.

14

Generally these laws are directed at ensuring that product sales ultimately are made to consumers and that advancement within sales organizations is based on sales of the enterprise's products, rather than investments in the organizations or other non-retail sales related criteria or activity. Where required by law, we obtain regulatory approval of our network marketing system, or, where approval is not required or available, the favorable opinion of local counsel as to regulatory compliance.

In addition to federal regulation in the United States, each state has enacted its own "Little FTC Act" to regulate sales and advertising. Occasionally we receive requests to supply information regarding our network marketing plan to regulatory agencies. Although we have from time to time modified our network marketing system to comply with interpretations of various regulatory authorities, we believe that our network marketing program is in compliance with laws and regulations relating to network marketing activities in our current markets. Nevertheless, we remain subject to the risk that, in one or more of our present or future markets, the marketing system or the conduct of certain Associates could be found not to be in compliance with applicable laws and regulations. Failure by an Associate or us to comply with these laws and regulations could have a material adverse effect on our business in a particular market or in general. Any or all of these factors could adversely affect the way we do business and could affect our ability to attract potential Associates or enter new markets. In the United States, the FTC has been active in its enforcement efforts against both pyramid schemes and legitimate network marketing organizations with certain legally problematic components, having instituted several enforcement actions resulting in signed settlement agreements and payment of large fines. Although to our knowledge, we have not been the target of an FTC investigation, there can be no assurance that the FTC will not investigate us in the future.

27.     The 2006 Form 10-K also stated the following concerning the Company's

distribution system:

We distribute products through a network marketing system, which is a form of person-to-person direct selling through a network of vertically organized independent distributors who purchase products at wholesale prices from the manufacturer and then make retail sales to consumers.

15

\*   \*   \*

Associates cannot simply recruit others for the purpose of developing a downline and earn income passively, depending solely on the efforts of their downline. Each Associate is required to purchase a certain amount of product each month ("Qualifying Purchases"), which they must either resell to consumers or personally use, in order to qualify to earn commissions or bonuses under USANA's Compensation Plan. Associates do not earn commissions on these Qualifying Purchases. The purpose of our Compensation Plan is to reward Associates for actively selling our products and for recruiting and retaining others to sell our products.

28. The 2006 Form 10-K stated the following concerning the sustainability of the

Company's business model:

**If the number or productivity of independent Associates does not increase, our revenue will not increase.** To increase revenue, we must increase the number and/or the productivity of our Associates. We can provide no assurances that the number of Associates will increase or remain constant, or that their productivity will increase. We experienced a 29.5%, 16.7%, and 15.0% increase in active Associates during 2004, 2005, and 2006, respectively. The number of active Associates may not increase and could decline in the future. Associates may terminate their services at any time, and, like most direct selling companies, we experience a high turnover among Associates from year to year. We cannot accurately predict any fluctuation in the number and productivity of Associates because we primarily rely upon existing Associates to sponsor and train new Associates and to motivate new and existing Associates. Operating results could be adversely affected if our existing and new business opportunities and products do not generate sufficient economic incentive or interest to retain existing Associates and to attract new Associates.

\*   \*   \*

*Attract and Retain Associates and Preferred Customers.* We recognize the need to continue to attract and retain Associates. We maintain emphasis on the partnership between the USANA management team and our Associate leaders. Through this partnership, our Associate leaders continue to host "Health &

16

Freedom" meetings and online presentations, both aimed at presenting the business opportunity to potential Associates and providing additional training and resources for existing Associates. In addition to our Annual International Convention and our Asia Pacific Convention, we hold several regional events in key growth areas to provide support and training to new Associates in these areas. We intend to continue growing our business by maintaining a focus on our two core values, "True Health" and "True Wealth." We plan to accomplish this by increasing the number of active Associates and teaching them how to build a strong customer base. By leveraging the current growth we have in our Associate field, we believe we can continue to attract individuals that are interested in joining a winning team and starting a home-based business with USANA.

29.     The 2006 Form 10-K stated the following concerning the Company's method of

counting "active Associates":

As of December 30, 2006, we had 153,000 active Associates and 78,000 active Preferred Customers worldwide. For purposes of this report, we only count as active customers those Associates and Preferred Customers who have purchased product from USANA at any time during the most recent three-month period.

30.     The 2006 Form 10-K stated the following concerning the Company's Associate

Compensation Plan:

*Attractive Associate Compensation Plan and Benefits.* We are committed to providing a highly competitive compensation plan to attract and retain Associates who constitute our sales force. We believe the USANA Associate compensation plan (the "Compensation Plan") is one of the most financially rewarding in the network marketing industry. Associate incentives totaled $146.3 million, or 40.1% of net sales for the Direct Selling segment in 2006. We pay Associate incentives weekly and our Compensation Plan is a global-seamless plan, meaning that Associates can be compensated each week for their business success in any market in which we conduct business. To support our Associates, we sponsor meetings and events throughout the year, which offer information about our products and our network marketing system. These meetings are designed to assist Associates in business development and to provide a forum for

interaction with successful Associates and the USANA management team. We also provide low cost sales tools, which we believe are an integral part of building and maintaining a successful home-based business for Associates.

31.     The 2006 Form 10-K also contained a Sarbanes-Oxley certification, signed by

defendants Myron Wentz and Gilbert Fuller, that stated:

> I, [Myron W. Wentz/Gilbert Fuller], certify that:
>
> 1.     I have reviewed this Annual Report on Form 10-K of USANA Health Sciences, Inc. (the "Registrant");
>
> 2.     Based on my knowledge, this Annual Report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this Annual Report;
>
> 3.     Based on my knowledge, the financial statements, and other financial information included in this Annual Report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this Annual Report;
>
> 4.     The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Registrant and have:
>
> > a)     designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this Annual Report is being prepared;
> >
> > b)     designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
> >
> > c)     evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this Annual Report our

conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this Annual Report based on such evaluation; and

d)   disclosed in this Annual Report any change in the Registrant's internal control over financial reporting that occurred during the Registrant's most recent fourth fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

5.   The Registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the Registrant's board of directors (or persons performing the equivalent functions):

a)   all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize and report financial information; and

b)   any fraud, whether or not material, that involves management or other employees who have a significant role in the the Registrant's internal control over financial reporting.

32.   In connection with the filing of the 2006 Form 10-K, a letter to shareholders signed by Dr. Myron Wentz and David Wentz, and included in the Company's annual report for 2006, contained the following material misrepresentations regarding the sustainability of the Company's business model:

**Our Associates—a cornerstone of our continued success**

USANA Associates, our single most valuable asset, are essential to our success. We ended 2006 with 153,000 active Associates, an increase of 15 percent from 133,000 Associates at the end of 2005. The number of Preferred Customers also grew by 11.4 percent. In addition to our world-class product lines, we also provide our Associates with the support they need to make growing their business as easy as possible. We offer superior customer service and straightforward Web-based sales and management programs, ranging from online product ordering to Website hosting. We also regularly create awardwinning sales tools that are affordable and easy to use. At the 2006 convention, we unveiled PresentationPro, a new software program designed to help Associates create

polished and up-to-date sales presentations. One of the convention's biggest announcements was our feature in the November 2006 issue of Success from Home. This national newsstand magazine dedicated the entire issue to USANA's products and home-based business opportunity, and Associates have had great success using it as a recruiting tool.

**The future—our next 15 years**

In 2007 we will commemorate our 15th year as a world-class company. And while we have many past accomplishments to celebrate, our future looks even brighter. We will continue to expand into promising markets and develop new products. However, we know that it is the fundamentals that make USANA great—our focused business strategy, our sciencebased products, and our world-class Associates. In summary, we want to thank the thousands of USANA Associates and nearly 900 employees worldwide who are tireless in their commitment to USANA and our long-term vision. With their dedication, we can look forward to our next 15 years of health and prosperity.

33. Throughout the Class Period, the Company's website, "www.usana.com" stated that the "average income for North American Associates in 2005 was $802.62."

34. The statements set forth in ¶¶ 15-33 above were materially false and misleading when made because defendants knowingly or recklessly disregarded and failed to disclose that: (1) the Company's MLM practice was an unlawful pyramid scheme; (2) like other pyramid schemes, the majority of the Company's Associates did not sell to consumers, but sold to other Associates; (3) like other pyramid schemes, the Company was experiencing an exceedingly high Associate attrition rate, resulting in an unsustainable sales force; (4) 74% of USANA's new Associates were failing within the first year; (5) 87% of the Company's Associates were losing money; (6) the Company had misrepresented the average income of its Associates in order to conceal the unsustainability of its business model; and (7) to minimize the reported number of inactive Associates the Company misleadingly reported customers active in the final three

months of the year as the total number of active customers for the whole year. Based upon the

foregoing, the Company's statements about its future business prospects were lacking in any

reasonable basis when made; and the Company's reported results and financial statements were

materially misstated.

### The Truth Begins to Emerge

35.     On March 15, 2007, the Fraud Discovery Institute issued a press release

announcing the publication of a massive report detailing the results of an investigation into

USANA's alleged improper business practices. On the same day, *The Wall Street Journal*

published an article entitled "Usana Sales Plan Draws Fire From Felon Turned Gumshoe," which

stated, in relevant part:

> The Fraud Discovery Institute, under the direction of Barry
> Minkow, has issued a report on public company, Usana Health
> Sciences, Inc., alerting authorities to possible fraud and also raising
> questions about the legitimacy of the entire multi-level marketing
> industry. *The Wall Street Journal* reported the story today.
>
> Minkow's 500 page report, addressed to the FBI, SEC and IRS and
> now posted on www.frauddiscovery.net, raises many serious
> concerns about Usana, including the company's alleged untenable
> business model whereby no less than 85% of current distributors
> are losing money and no less than 74% of distributors fail within
> the first year. Yet these distributors account for 86% of the
> company's multi-level marketing revenue.
>
> The report also documents another secret of the Usana business --
> specifically that only 3% of distributors receive 70% of company-
> paid commissions, which, in turn, skews the alleged "average
> income figure" for distributors posted on the company's web site.
>
> Minkow also attacked the very heart of the Usana business model
> by allegedly debunking the myth that manufacturer direct-to-
> distributor sales and purchases saves distributors and preferred
> Usana customers "75%" because it avoids the traditional method of
> retail sales with national, regional and local retail outlets marking

up the cost of the item. However, by hiring two accredited, independent labs, the Fraud Discovery Institute appears to have demonstrated that Usana's best selling vitamin products are hopelessly overpriced and, in one example, were over 400% more expensive than a comparable over the counter health food store-bought product. "If this is the case, one would expect the company to struggle with reselling these products because of their huge markup. The evidence appears to show just that, as only 14% of company revenues stem from retail sales."

According to Minkow: "From 2003 to 2006 the company repurchased 3,881,000 in stock with cash from operations totaling 133,377,000, while insiders sold off over 95 million in exercised options. That, in itself, is not wrong, but since the operating cash of the company to repurchase these shares came from the undisclosed attrition rates of collapsed distributors who had bought into the "True Wealth" dream of Usana, but instead lost money and went into further debt, the Usana management literally funded stock buy backs that enriched themselves from those failed distributors who could least afford to lose money. That is wrong, that is evil," Minkow said.

Moreover, while Wall Street analysts who follow USANA continue to recommend a strong buy for the stock, the Minkow report may demonstrate a material failure by many analysts to understand the 'below the iceberg' effects of the Usana numbers. Says Minkow, "While many analysts point to things like EBITA and EPS, they ignore -- because they are purposely kept in the dark by Usana's failure to disclose material facts -- critical factors such as the obvious: the largest portion of Usana's revenue comes from distributors who are in a constant state of collapse with 85% of these distributors losing money and no less than 74% failing within a 12 month time period, causing significant saturation challenges that will materially impact the company."

"If new distributors knew about failure and collapse rates, the inability to resell hopelessly overpriced products and that most of the money paid in commissions goes to the top 3% of the Usana distributors, Usana's ability to attract new distributors would be materially adversely affected, which appears to be why they have chosen not to disclose any of these facts."

There are also significant management credibility issues with Dr. Myron Wentz, the company Chairman and Founder and majority

stock holder, who renounced his U.S. citizenship and misrepresented the location of the entity that controls 46% of Usana stock -- it is in the tax-haven country of Liechtenstein.

36.     Upon the release of this shocking news, shares of the Company's common stock declined $8.92 per share, or over 15%, to close on March 15, 2007 at $49.85 per share, on unusually heavy trading volume.

37.     In the evening of March 15, 2007, USANA tried to control the damage to its stock price by issuing a press release announcing that it had filed a defamation action against the Fraud Discovery Institute and its co-founder, Barry Minkow, in U.S. District Court in Salt Lake City, Utah.

38.     In response to USANA's lawsuit, on March 18, 2007, the Fraud Discovery Institute published a detailed letter further discussing USANA's wrongful and fraudulent business practices. Among other things, the letter stated that (1) 87% of USANA Associates lose money; (2) the majority of USANA's Associates' sales were made to each other and not to consumers; and (3) USANA's published average Associate incomes were misleading as only 3% of Associates received 70% of all commissions.

39.     On March 19, 2007 the Company announced that the SEC was commencing an informal investigation into the Company.

## USANA'S MATERIALLY FALSE FINANCIAL STATEMENTS

40.     The financial results reported by USANA during the Class Period and the Company's Class Period financial statements were materially false and misleading.

41.     The true facts, which were known to the defendants, but concealed from the investing public were as follows:

(a)    USANA's MLM system was an unlawful pyramid scheme and its marketing practices were not in accord with applicable state and federal laws;

(b)    As a pyramid scheme, the Company's marketing plan was unsustainable and could not be relied upon to provide a consistent, reliable source of income in the future, as 87% of USANA's current Associates were losing money;

(c)    Instead of earning the majority of their commissions by selling USANA's products to consumers, consistent with the pyramid scheme, Associates earned the vast majority of their commissions by selling the Company's products to other Associates;

(d)    74% of USANA's new Associates were failing within the first year;

(e)    defendants disseminated deceptive "average income" numbers for all Associates, when in fact, only 3% of Associates received 70% of Associate compensation;

(f)    defendants misleadingly counted only Associates active during the final three months of the year as "active Associates," instead of counting persons active at some time during the year, which minimized the number of reported inactive Associates.

42.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X (17 C.F.R. § 210.4 01(a) (1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.

43.    By failing to disclose the aforementioned adverse facts, the Company's financial statements violated the following GAAP provisions:

(a)    The principle that "financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit, and similar decisions" was violated (FASB Statement of Concepts No. 1, ¶34);

24

(b)     The principle that "financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events, and circumstances that change resources and claims to those resources" was violated (FASB Statement of Concepts No. 1, ¶40);

(c)     The principle that "financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it" was violated. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(d)     The principle that "financial reporting should be reliable in that it represents what it purports to represent" was violated (FASB Statement of Concepts No. 2, ¶¶58-59);

(e)     The principle that "completeness, meaning that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions" was violated (FASB Statement of Concepts No. 2, ¶79);

(f)     The principle that "conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered" was violated. The best way to avoid injury to investors is to try to ensure that what is reported represent what its purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

44.     Further, the undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

## CLASS ACTION ALLEGATIONS

45.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or

otherwise acquired USANA common stock between July 14, 2006 through and including March 14, 2007, and who were damaged thereby. Excluded from the Class are the Individual Defendants, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

46.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, USANA common stock was actively traded on NASDAQ under the stock symbol "USNA." While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by USANA or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

47.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

48.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests that conflict with those of the class.

49.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

> (a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of USANA;

(c)    whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    whether defendants knew or recklessly disregarded that their statements were false and misleading;

(e)    whether the price of USANA common stock was artificially inflated; and

(f)    to what extent the members of the Class have sustained damages and the proper measure of damages.

50.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## LOSS CAUSATION

51.    During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated or distorted the price of USANA common stock and operated as a fraud or deceit on the Class. Defendants achieved this by making positive statements about USANA's business and financial results to the investing public while concealing material information, including that USANA's business operated as a pyramid scheme. When the truth was disclosed to the market, the price of USANA common stock fell precipitously. As a result of their transactions in USANA common stock during the

Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

52.     As a direct result of the public revelations regarding the truth about USANA's business practices, the price of USANA common stock closed at $49.85 on March 15, 2007, a decline of over 15% from the previous day's closing price of $58.77 and a decline of almost 20% from the Class Period high trading price, which had been reached only 22 days earlier. This drop removed artificial inflation and distortion from USANA common stock, thus causing real economic loss to investors who purchased USANA stock during the Class Period.

53.     The timing and magnitude of the decline of USANA common stock negate any inference that the losses suffered by plaintiff and other Class members was caused by changed market conditions, industry factors, or facts unrelated to defendants' fraudulent conduct.

## ADDITIONAL SCIENTER ALLEGATIONS

54.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding USANA their control over, and/or receipt and/or modification of USANA's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning USANA, participated in the fraudulent scheme alleged herein.

28

55.     Defendants knew or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public.  The fraudulent scheme described herein, which concerns the heart of the Company's business model, could not have been perpetrated without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

56.     The Individual Defendants had the opportunity to perpetrate the fraudulent scheme and course of business described herein because they were the most senior officers of USANA and they issued statements and press releases on behalf of the Company.

57.     The Individual Defendants were motivated to engage in a fraudulent course of conduct as it allowed them to sell 133,700 shares of their personally-held USANA stock at inflated prices for gross proceeds in excess of $7,389,400. The shares sold by the Individual Defendants during the Class Period are set in the following chart:

| Name | Date | Shares | Price | Proceeds |
|------|------|--------|-------|----------|
| Fuller, Gilbert | 10/19/06 | 33,700 | $44.95 | $1,541,815 |
| | | | | |
| Wentz, David | 7/28/06 | 5,000 | $43.75 | $218,750 |
| | 8/14/06 | 5,000 | $44.35 | $221,750 |
| | 8/15/06 | 5,000 | $44.76 | $223,800 |
| Total: | | 15,000 | | $664,300 |
| | | | | |
| Wentz, Myron | 2/12/07 | 85,000 | $60.98 | $5,183,300 |

58.     Defendants' fraudulent scheme also allowed other Company insiders to sell hundreds of thousands of shares of USANA common stock at artificially inflated or distorted prices.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET DOCTRINE

59.    At all relevant times, the market for USANA common stock was an efficient

market for the following reasons, among others:

(a)    USANA common stock met the requirements for listing, and was listed and actively traded on NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, USNA filed periodic public reports with the SEC and NASDAQ;

(c)    USANA regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    USANA was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

60.    As a result of the foregoing, the market for USANA common stock promptly

digested current information regarding USANA from all publicly-available sources and reflected

such information in the price of USANA common stock. Under these circumstances, all those

who traded in USANA common stock during the Class Period suffered similar injury through

their purchases of USANA common stock at artificially inflated or distorted prices and a

presumption of reliance applies.

## NO SAFE HARBOR

61.    The statutory safe harbor provided for forward-looking statements under certain

circumstances does not apply to any of the allegedly false statements pleaded in this complaint.

Many of the specific statements pleaded herein were not identified as "forward-looking

statements" when made. To the extent there were any forward-looking statements, there were no

meaningful cautionary statements identifying important factors that could cause actual results to

differ materially from those in the purportedly forward-looking statements. Alternatively, to the

extent that the statutory safe harbor does apply to any forward-looking statements pleaded

herein, Defendants are liable for those false forward-looking statements because at the time each

of those forward-looking statements was made, the particular speaker knew that the particular

forward-looking statement was false, and/or the forward-looking statement was authorized

and/or approved by an executive officer of USANA who knew that those statements were false

when made.

### FIRST CLAIM

#### Violation Of Section 10(b) of
#### The Exchange Act and Rule 10b-5
#### Promulgated Thereunder Against All Defendants

62.     Plaintiff repeats and realleges each and every allegation contained above as if

fully set forth herein.

63.     During the Class Period, defendants carried out a plan, scheme and course of

conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing

public, including plaintiff and other Class members, as alleged herein; and (ii) cause plaintiff and

other members of the Class to purchase USNA common stock at artificially inflated or distorted

prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each

of them, took the actions set forth herein.

64.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made

untrue statements of material fact and/or omitted to state material facts necessary to make the

statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon those who traded in USANA common stock in an effort to maintain artificially inflated or distorted market prices for USANA common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are named either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

65.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of USANA as specified herein.

66.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of USANA's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about USANA and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon those who traded in USANA common stock during the Class Period.

67.     Each of the Individual Defendant's primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives

32

and/or directors at the Company during the Class Period and members of the Company's

management team or had control thereof; (ii) each of these defendants, by virtue of his

responsibilities and activities as a senior officer and/or director of the Company was privy to and

participated in the creation, development and reporting of the Company's internal budgets, plans,

projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and

familiarity with the other defendants and was advised of and had access to other members of the

Company's management team, internal reports and other data and information about the

Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants

was aware of the Company's dissemination of information to the investing public which they

knew or recklessly disregarded was materially false and misleading.

68.    The Defendants had actual knowledge of the misrepresentations and omissions of

material facts set forth herein, or acted with reckless disregard for the truth in that they failed to

ascertain and to disclose such facts, even though such facts were available to them.  Such

Defendants' material misrepresentations and/or omissions were done knowingly or recklessly

and for the purpose and effect of concealing USANA's operating condition and future business

prospects from the investing public and supporting the artificially inflated or distorted price of

USANA common stock.  As demonstrated by Defendants' misstatements of the Company's

business and operations throughout the Class Period, Defendants, if they did not have actual

knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain

such knowledge by deliberately refraining from taking those steps necessary to discover whether

those statements were false or misleading.

69. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of USANA common stock was artificially inflated or distorted during the Class Period. In ignorance of the fact that market prices of USANA common stock were artificially inflated or distorted, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which USANA common stock trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class purchased and/or acquired USANA common stock at artificially inflated or distorted prices during the Class Period, and were damaged thereby.

70. At the time of defendants' misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiffs and the other members of the Class and the marketplace known the truth regarding USANA's business practices, which were not disclosed by defendants, plaintiffs and other members of the Class would not have traded in USANA common stock or would not have traded in USANA common stock at the artificially inflated or distorted prices that were paid.

71. By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

72. As a direct and proximate result of defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their respective transactions in USANA common stock during the Class Period.

34

## SECOND CLAIM

### Violation of Section 20(a) of
### The Exchange Act Against the Individual Defendants

73.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

74.     The Individual Defendants acted as controlling persons of USANA within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

75.     In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

76.     As set forth above, USANA and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their

35

positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchase of USANA common stock during the Class Period.

WHEREFORE, plaintiff prays for relief and judgment, as follows:

a.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

b.    Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d.    Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury.

Dated: March 26, 2007

GRAHAM LAW OFFICES

By: _____
Jan Graham (01231)
Ambassador Plaza
150 South 600 East Suites 5A & 5B
Salt Lake City, UT 84102
Telephone: (801) 596-9199
jan@grahamlawoffices.com

Lee A. Weiss
DREIER LLP
499 Park Avenue
New York, New York 10022
Telephone: (212) 328-6100
lweiss@dreierllp.com

*Attorneys for Plaintiff*

## PLAINTIFF'S CERTIFICATION
## USANA Health Sciences, Inc.

I, Ashok Kapur, hereby declare under penalty of perjury that:

1.   I have reviewed and authorize the filing of the complaint against USANA Health Sciences, Inc., alleging violations of the federal securities laws.

2.   I did not purchase the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in this action.

3.   I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.   My transactions during the Class Period (3/25/02-3/14/07) are as set forth below:

Purchases

| Date of Purchases | Number of Shares Purchased | Price per Share |
|---|---|---|
| 2/16/07 | 113 | 60.93 |

Sales

| Date of Sale(s) | Number of Shares Sold | Price per Share |
|---|---|---|
| 3/16/07 | 113 | 48.90 |

5.   I have made no transactions that are the subject of this action except for those set forth above.

6.   During the three years prior to the date of this Certification, I have not sought to serve or served as a representative party for a class action under the federal securities laws except in this litigation.

7.   I will not accept any payment for serving as a representative party on behalf of the class beyond my pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is unaffected by my decision to serve as a representative party.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 21st day of March , 2007

_____
Signature

Ashok Kapur