**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| ASHOK KAPUR, | |
| **Plaintiff,** | **MEMORANDUM DECISION AND ORDER** |
| vs. | |
| USANA HEALTH SCIENCES, INC., MYRON W. WENTZ, DAVID A.  WENTZ, and GILBERT A.  FULLER | Case No.  2:07-CV-00177DAK |
| | Judge Dale A. Kimball |
| **Defendants.** | |

This matter is before the court on Defendants USANA Health Sciences, Inc., Myron W.

Wentz, David A. Wentz, and Gilbert A. Fuller's Motion to Dismiss.  The court held a hearing on

the motion on June 4, 2008.  At the hearing, Daniel B. Scotti and Jan Graham represented Lead

Plaintiff Irina Sech, and James Jardine, Mark Pugsley, and Andrew Shoemaker represented

Defendants.  Following the hearing, the court took the matter under advisement.  Now, having

carefully considered the memoranda and additional materials submitted by the parties, as well as

the relevant law and facts relating to the motion, the court renders the following Memorandum

Decision and Order.

## BACKGROUND

USANA is a publicly traded Utah company that develops and manufactures nutritional,

personal care, and weight management products.  Myron Wentz, who founded USANA

approximately fifteen years ago, is the company's CEO and chairman of the board of directors. David Wentz is the company's president, and Fuller is USANA's chief accounting officer and executive vice president.

USANA sells its products worldwide, reporting net sales of approximately $100 million for the first quarter of 2008.  To distribute and sell its products, USANA employs a multi-level marketing system business model.  This model utilizes vertically-organized independent distributors (Associates).  USANA also sells directly to "preferred customers," who purchase USANA products for personal use.  Unlike Associates, preferred customers cannot resell products.  USANA reports that as of December 2007, the company had 176,000 active Associates and 78,000 preferred customers.

On February 21, 2007, USANA stock was trading at a high of $61.80.  Less than a month later, on March 15, 2007, the Wall Street Journal published an article, entitled "USANA Sales Plan Draws Fire from Felon Turned Gumshoe," discussing a detailed report by the Fraud Discovery Institute, a for-profit investigative entity, that alleged improper business practices by USANA.  The report stated that USANA's business model was unsustainable because the vast majority of the company's reported sales were made to distributors who were not end users of the products; that the company's long-term growth prospects were precarious because growth was almost entirely dependent upon recruitment, rather than upon an increase in retail demand for the company's products; that at least 85% of USANA's distributors—accounting for 86% of the company's revenues—were losing money; that at least 74% of distributors failed within the first year; that only 3% of top distributors were receiving 70% of company-paid commissions; that the company misrepresented the average income for distributors; that USANA products

2

were greatly overpriced; and that the company's ability to attract new distributors would be materially adversely affected if prospective distributors were aware of both the company's failure and collapse rates and Associates' inability to resell overpriced products, as well as the fact that the top 3% of USANA Associates receive most of the commissions.

Immediately following publication of the Wall Street Journal article, shares of USANA's common stock fell $8.92 per share, or over 15%, to close at $49.85 per share, on unusually heavy trading volume. On March 19, 2007, the Securities and Exchange Commission (SEC) announced that it was commencing a formal investigation of USANA. The SEC subsequently dismissed this investigation.

On March 27, 2008, USANA indicated that the company was posting disappointing financial results for the first quarter of 2008 due to difficulties in recruiting new Associates. The company suggested that its difficulties in attracting Associates would likely result in a 20% decrease in net sales and earnings growth for 2008. In a conference call with securities analysts, Fuller stated that "from [USANA's] early analysis, it looks like North America accounted for the majority of the slowdown. . . . [USANA] ha[s] received feedback . . . that current market conditions have resulted in more difficult recruiting efforts for our Associates."

Later that same day, analysts downgraded USANA stock. On March 28, 2008, the stock fell almost 21%, from $26.94 to $21.34.

In her class action lawsuit, Lead Plaintiff alleges that Defendants violated anti-fraud provisions of federal securities laws in (1) hiding from investors the close resemblance between USANA and an illegal pyramid scheme, (2) misleading investors regarding the long-term sustainability of the company's sales growth and business model, and (3) misleading investors

regarding the potential impact of a proposed Federal Trade Commission (FTC) rule on USANA's future business prospects.

**<u>USANA Business Model and Long-Term Sustainability</u>**

According to Lead Plaintiff, there was actually very little retail demand for USANA's products and USANA focused its business efforts on recruiting new Associates, not on selling product to retail consumers.  Lead Plaintiff states that the company rewarded Associates for recruiting efforts with frequent promotional events, such as trips to Hawaii and Europe, cash prizes, cars, and theater tickets.  Confidential witnesses explain that to qualify for these contests, an Associate had to recruit a certain number of new Associates (usually twenty-five).  Confidential witnesses also estimate that 85% of Associate training was focused on recruitment.

Lead Plaintiff claims that there was minimal actual retail demand for USANA's products.  Lead Plaintiff reports that USANA's products were over 400% more expensive than comparable products.  For example, a 28-day supply of USANA multivitamins sold for $40.00, over twenty dollars more than a similar multivitamin sold by retailer GNC.  Such overpricing on products inhibited Associates from making retail sales.  One confidential witness, who worked as an order express agent in the company's Tooele, Utah office, recalled frequent complaints from Associates that consumers were not interested in purchasing the products because they were overpriced.

Lead Plaintiff alleges that the lack of real demand for USANA products resulted in the vast majority of Associates (at least 85%) losing money and the company suffering huge turnover and attrition of Associates.  The Fraud Discovery Institute report indicates that at least

74% of distributors failed within the first year of employment and that those Associates who did make money received the majority of commissions paid by the company. For example, in 2006, the top 2.6% of Associates received 72.2% of total commissions paid in North America. Approximately 66% of Associates in North America received no commission at all in 2006. Although USANA generated profits for early entrants in the business, opportunity for later entrants to make money progressively diminished, leaving the top 3% of Associates earning 70% of company-paid commissions.

In her Second Amended Complaint, Lead Plaintiff states that the vast majority of USANA's reported sales came from the Associates themselves and that USANA required new Associates to make large, up-front payments for training materials. One former Associate reportedly paid $1200.00 to sign-up as an Associate with USANA. Another former Associate recalls paying $1200.00 - $1400.00 as a sign-up fee. To receive commissions, Associates had to make minimum monthly purchases of USANA products, regardless of whether those Associates were actually selling products to end users outside the distribution chain. The minimum quantity of USANA products Associates had to purchase depended on the number of business centers that the Associate maintained. For instance, if an Associate maintained one USANA business center, he or she needed to earn at least 100 "business value points" per month, by ordering a minimum of $100 of USANA products.

Lead Plaintiff cites confidential witnesses working within the company who report that USANA carefully monitored USANA's Associate attrition rate. A former data warehouse specialist at USANA's Salt Lake City facility recalls that monthly reports that included details regarding the company's Associate attrition rate were regularly emailed to senior management,

including Fuller and David Wentz.  Another confidential witness, who formerly worked as a

senior-level finance manager for USANA, recalled discussing Associate attrition reports with

Fuller and other senior officers at regularly scheduled weekly meetings.

Lead Plaintiff alleges that it was USANA's high Associate attrition rate that caused the

company to recruit tens of thousands of new Associates each year.  Eventually, the pool of

prospective Associates became saturated, and the company had difficulties attracting new

members.  USANA's competitors in the personal care products industry, on the other hand, were

experiencing exceptional growth, further shrinking the already small market for USANA

Associates.  For example, from 2005 to 2006, USANA competitor Herbalife grew its number of

supervisors by 20.6%.  According to one confidential witness who worked for USANA, many of

the regions where USANA operated were saturated by both products and distributors.

As the market became saturated, Lead Plaintiff claims it became increasingly difficult for

the company to attract new Associates.  According to Lead Plaintiff, the company began to

misrepresent the income of the typical Associate.  USANA claimed that the average Associate

income in 2005 was $802.62.  But Lead Plaintiff alleges that a majority of Associates made no

income.  Additionally, USANA counted as active only those Associates and preferred customers

who had purchased product during the most recent three-month period.  A confidential witness

who regularly reviewed the company's payroll checks estimates that the company overstated the

average income per Associate by approximately 35%.

Lead Plaintiff alleges that despite being fully aware of the above facts and the true nature

of the company and its long-term sustainability, the company continued to publicly represent and

reassure investors that USANA's success was due to consumer demand for its products and

Associate growth.  For instance, in a July 18, 2006 press release, USANA attributed its strong

reported sales and revenue growth to "continued interest in [the company's] products."  The

company further stated in the press release that the primary reason for the company's sales

growth was the "consistent growth of Active Associates" and the "business opportunity that

USANA offers its Associates."  In an October 17, 2006 press release, USANA attributed its

financial success to "growth in sales, earnings, [and] . . . Associates" and "double digit sales

growth."  In this same press release, USANA also stated that "[it] expect[ed] to grow both net

sales and earnings per share between 15% and 17%."  On October 16, 2006, Fuller held a

conference call with securities analysts in which, in response to a question about market

saturation, Fuller responded that the company "certainly d[idn]'t feel like the U.S. market [was]

saturated."  On January 10, 2007, USANA issued a press release in which the company touted

USANA's "strong results" as "reflect[ing] the hard work and dedication of [the company's]

Associates as well as the market's continued enthusiasm for [USANA's] science-based

products."  And on February 6, 2007, USANA issued a press release stating that the company's

"results demonstrate [its] ability to grow in both . . . mature markets and in . . . newer markets."

Lead Plaintiff also notes that on February 6, 2007, the day USANA touted its ability to

grow in both mature and newer markets, Myron Wentz sold 85,000 shares for proceeds totaling

$5.1 million.  This sale occurred fifteen days prior to USANA stock hitting a high of $61.80 per

share.

**Proposed FTC Rule**

According to Lead Plaintiff, Defendants not only omitted material information about

USANA's business model and misled investors about the company's long-term sustainability,

they also misled investors about the impact of a proposed FTC rule that was designed to protect targets of aggressive recruiting efforts of direct selling companies like USANA.  The proposed FTC rule included requirements mandating that direct selling companies provide prospective recruits with detailed disclosure statements that explain the company's attrition rate, any required minimum purchases, any up-front fees, and any legal actions against the company.  The proposed FTC law also required a seven-day waiting period before new recruits could join the company.

USANA lobbied heavily against the proposed rule.  On June 30, 2006, David Wentz sent a letter to the FTC, stating that the proposed FTC law "could hinder or even ruin USANA's business . . . [and] will make it difficult, if not impossible, for USANA and our independent distributors to continue growing our respective businesses."  On July 17, 2006, the Direct Selling Association (DSA), a national trade association of direct sales companies, for which David Wentz is a board member, stated that the proposed FTC rule would, among other things, do "significant harm" to legitimate direct sellers, "fundamentally and adversely alter the way in which direct selling operates," and "result in the loss of interest by many recruits."  The DSA estimated that the level of interest by prospective recruits would drop as much as 57% if the proposed law resulted in a seven-day waiting period.

On July 19, 2006, a date within the class period and less than a month after the company sent the letter to the FTC, David Wentz held a conference call with securities analysts.  During this call, David Wentz stated:  "We're pretty confident that there won't be anything that disrupts business very much, probably not even at all . . . we are not concerned about it."

8

**Disclosures During the Class Period**[1]

Both USANA's Q2 2006 10-Q and 2006 10-K discuss the proposed FTC rule.  In the

company's 2006 10-Q, Defendants stated that the proposed rule "might require USANA to

change some of its current practices."  In its 2006 10-K, USANA declared that "the rule

ultimately may not be implemented in a form that applies to network marketing compensation

plans, or it may change significantly before it is implemented.  If the proposed rule were adopted

as currently proposed, it would require USANA to change its current practices regarding pre-sale

disclosures."

The company's 2006 10-K also discussed the role and significance of Associates.  The

10-K described Associates as "independent distributors" who "are compensated on sales

generated by their business group, or downline" or "by purchasing products at wholesale prices

and selling them at retail prices."  The 10-K stated that the company "rel[ies] on . . . Associates

to purchase, market, and sell [its] products"; and the company "seek[s] to grow [the] business by

. . . attract[ing] and retain[ing] Associates."  The 2006 10-K explained that "Associates . . .

purchase products directly for their own use or for resale"; Associates "cannot simply recruit

others for the purpose of developing a downline and earn income passively, depending solely on

the efforts of their downline";  "[e]ach Associate is required to purchase a certain amount of

product each month . . . which they must either resell to consumers or personally use"; "[n]ew

---

[1]  The court can properly consider SEC filings when adjudicating a motion to dismiss.
*See Roth v. Jennings*, 489 F.3d 499, 503 (2d Cir. 2007); *see also Jacobsen v. Deseret Book Co.*,
287 F.3d 936, 941-42 (10th Cir. 2002).

Associates are . . . required to purchase a starter kit [that sells]" . . . for a price of approximately $49"; and Associates may continue to distribute products but are "[s]ubject to payment of an annual renewal fee."  Regarding Associates, the 2006 10-K further provided that "net sales are directly dependent upon the efforts of . . . Associates"; "[t]o increase revenue, [the company] must increase the number and/or productivity of . . . Associates"; and USANA's "future growth in sales volume will depend in large part upon [the company's] success in increasing the number of new Associates and improving the productivity of Associates."  The 10-K stated that "[t]here is typically significant turnover in Associates from year to year," forcing the company to "continually recruit new Associates"; the company "provide[s] no assurances that the number of Associates will increase or remain constant, or that their productivity will increase"; "[t]he number of active Associates may not increase and could decline in the future"; "[o]perating results could be adversely affected if [the company's] existing and new business opportunities and products do not generate sufficient economic incentive or interest to retain existing Associates and to attract new Associates"; "[t]here can be no assurance that [the company's] programs for recruiting and retaining Associates will be successful"; and the company "cannot accurately predict any fluctuation in the number and productivity of Associates."

The 2006 10-K reported that active Associates accounted for 86% of net sales, preferred customers accounted for 14% of net sales, and that the company "ended 2006 with 153,000 active Associates, an increase of 15% from 133,000 Associates at the end of 2005."  USANA also noted that the 10-K "only count[s] as active those Associates and preferred customers who have purchased products from USANA at any time during the most recent three-month period."

Additionally, USANA's 2006 10-K explained that USANA's "business is subject to the

10

risk associated with intense competition from larger, wealthier, and more established competitors."  The 10-K noted that USANA cannot guarantee its ability to remain competitive due to the intensity of the competition, the "wide variety of channels of distribution" for nutrition and personal care products available to consumers, and USANA's "relatively small" product offerings compared to competitors.

USANA's 2006 10-K stated that "[n]etwork marketing is subject to intense government scrutiny," including FTC anti-pyramiding investigations in the United States, and "frequently subject to laws and regulations directed at ensuring that product sales are made to consumers of the products and that compensation, recognition, and advancement within the marketing organization are based on the sale of products rather than investment in the sponsoring company"; there is "no assurance that the FTC will not investigate [USANA] in the future"; the company is "subject to the risk that . . . [its] marketing system could be found not to comply with these laws and regulations or may be prohibited"; and "such a prohibition could have a material adverse effect on [the company's] business, financial condition, and results of operations."

USANA 2006 10-K also stated that the company "is subject to the effects of adverse publicity and negative public perception and there are no assurances that adverse publicity and negative public perception will not occur or that such adverse publicity will not have a material adverse effect on our business, financial condition, and results of operations."

**Procedural History**

Based upon investigation of counsel, Lead Plaintiff filed suit on March 26, 2007, alleging

that Defendants violated anti-fraud provisions of federal securities laws.[2]  In October 2007, this court issued an order consolidating this action with two other shareholder class action complaints against USANA and appointing Irina Sech as lead plaintiff and Jan Graham as lead and liaison counsel.[3]  On December 3, 2007, Lead Plaintiff filed an amended consolidated class action complaint on behalf of purchasers of common stock of USANA.

On April 14, 2008, this court granted Lead Plaintiff's request to amend the December 2007 class action complaint.  On April 18, 2008, Lead Plaintiff filed her Second Amended Consolidated Class Action Complaint (Second Amended Complaint), in which she extends the class period to between July 18, 2006, and March 27, 2008.

Defendants now move to dismiss Lead Plaintiff's Second Amended Complaint for failure to state a claim.

---

[2]  According to Lead Plaintiff, counsel's investigation included interviews of former Associates and employees of USANA; USANA public filings, including SEC filings; news articles, press releases, analyst conference calls, and securities analyst reports; reports by and other materials from the Fraud Discovery Institute; pleadings and other court documents in a California Superior Court case; SEC filings of USANA competitors; legal precedents and statutes concerning illegal pyramid schemes; and additional information available on the Internet.

[3]  This case consolidates 2:07CV00214TS and 2:07CV00280BSJ

## DISCUSSION

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants move to dismiss Lead Plaintiff's Second Amended Complaint.  In her Second Amended Complaint, Lead Plaintiff alleges that Defendants violated anti-fraud provisions of federal securities laws in (1) hiding from investors the close resemblance between USANA and an illegal pyramid scheme, (2) misleading investors regarding the long-term sustainability of the company's sales growth and business model, and (3) misleading investors regarding the potential impact of a proposed FTC rule on USANA's future business prospects.  *See* Fed. R. Civ. P. 12(b)(6).

## I.      Rule 12(b)(6) Standard

A rule 12(b)(6) motion to dismiss tests the sufficiency of a complaint.  *See Sunrise Valley, LLC v. Kempthorne*, 528 F.3d 1251, 1254 (10th Cir. 2008).  "[I]n determining whether to grant a motion to dismiss for failure to state a claim, the court 'look[s] to the specific allegations in the complaint to determine whether they plausibly support a legal claim for relief.'"  *Pace v. Swerdlow*, 519 F.3d 1067, 1073 (10th Cir. 2008); *see also Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 n.2 (10th Cir. 2007) (recognizing and adopting the plausibility standard recently established by the Supreme Court in *Bell Atlantic v. Twombly*, 127 S. Ct. 1955 (2007)). [4]  Under

---

[4]  *See Pace v. Swerdlow*, 519 F.3d 1067, 1073 (10th Cir. 2008) (Gorsuch, J., concurring) (explaining that [p]rior to [*Bell Atlantic v. Twombly*, 127 S. Ct. 1955 (2007)], every law student learned from their civil procedure professors the familiar . . . refrain that dismissal is inappropriate . . . unless it appears beyond a reasonable doubt that the plaintiff can prove 'no set of facts' entitling it to relief").

the plausibility standard, it is the plaintiff's burden to frame a "'complaint with enough factual matter (taken as true) to suggest'" that he or she is entitled to relief. *Robbins v. Oklahoma,* 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly,* 127 S.Ct. at 1965). To satisfy this burden, a plaintiff must allege sufficient facts to "'nudge their claims across the line from conceivable to plausible.'" *Id.* (quoting *Twombly,* 127 S.Ct. at 1974).

## II.      Rule 10b-5 Claims

In her Second Amended Complaint, Lead Plaintiff asserts that Defendants violated anti-fraud provisions of federal securities laws. "Private federal securities fraud actions are based upon federal securities statutes and their implementing regulations." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341 (2005). The Securities Exchange Act of 1934 prohibits the "use or employ[ment], in connection with the purchase or sale of any security . . . , [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the SEC may prescribe." 15 U.S.C. § 78j(b). SEC rule 10b-5 provides that

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5(a)-(c).

To state a claim for rule 10b-5 securities fraud, a plaintiff must allege the following elements:

> (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.

*Stoneridge Inv. Partners, L.L.C v. Scientific-Atlanta*, 128 S.Ct. 761, 768 (2008); *see also Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1095 (10th Cir. 2003). The Supreme Court has described "'loss causation,' [as] the causal connection between the material misrepresentation and the loss." *Dura*, 544 U.S. at 341.

Importantly, in 1995, Congress, in an effort to curb abuse in private securities lawsuits, passed the Private Securities Litigation Reform Act (PSLRA). The PSLRA imposed new restrictions on private securities actions. These restrictions included heightening pleading standards and providing a safe harbor from liability for certain types of statements made by a defendant. *See Anderson v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 521 F.3d 1278, 1280 (10th Cir. 2008).

In their Motion to Dismiss, Defendants contest the sufficiency of Lead Plaintiff's Second Amended Complaint on several grounds. First, Defendants claim that the alleged misrepresentations and omissions are not actionable under the law because they are either immaterial or not subject to disclosure requirements. Second, Defendants assert that even if the alleged misrepresentations or omissions are actionable, Lead Plaintiff's claims nonetheless fail because she has not satisfied the PSLRA's heightened pleading requirements.

In the following analysis, the court first sets forth the relevant law regarding actionable federal securities claims and PSLRA pleading requirements. The court then applies the governing law to Lead Plaintiff's allegations that (1) Defendants hid from investors the close

resemblance between USANA and an illegal pyramid scheme, (2) Defendants misled investors regarding the long-term sustainability of the company's sales growth and business model, and (3) Defendants misled investors regarding the potential impact of the proposed FTC rule on USANA's future business prospects.

## A.   Actionable Misrepresentations or Omissions

First, it is well established that "an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts." *In re Time Warner, Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993); *see also Chiarella v. United States,* 445 U.S. 222, 235 (1980) ("When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak.").  "[T]he general rule [is] that the federal securities laws do not impose a duty upon parties to publicly admit the culpability of their actions." *Lewis v. Chrysler Corp.*, 949 F.2d 644, 652 (3d Cir. 1991) (second alteration in original) (quotations and citation omitted).  In other words, uncharged unlawful conduct is one fact that corporations have no duty to disclose. *See In re Sofamar Danek Group, Inc.*, 123 F.3d 394, 402 (6th Cir. 1997).  "[I]n the absence of such a rule, parties would be placed in the untenable position of either publicly confessing their potential misconduct before their guilt is properly determined by a court, or incurring liability for damages resulting from their failure to disclose the misconduct." *Lewis*, 949 F.2d at 652 (quotations and citation omitted).

Second, for a misrepresentation to be actionable under federal securities law, the misrepresentation must be material.  *See Parnes v. Gateway 2000 Inc.*, 122 F.3d 539, 546 (8th Cir. 1997).  A statement is "only material if a reasonable investor would consider it important in

determining whether to buy or sell stock." *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th

Cir. 1997); *see also Basic, Inc. v. Levinson*, 485 U.S. 224, 240 (1988). "Whether information is

material also depends on other information already available to the market." *Grossman*, 120

F.3d at 1119. "[U]nless the statement 'significantly altered the total mix of information'

available, it will not be considered material." *Id.* (quoting *TSC Indus., Inc. v. Northway, Inc.*,

426 U.S. 438, 449 (1976)) (additional quotations omitted).

Materiality is a mixed question of law and fact typically reserved for the fact finder. *See*

*TSC Indus.*, 426 U.S. at 450. However, the PSLRA and Tenth Circuit case law recognize certain

types of representations as immaterial and thus not actionable. *See Karacand v. Edwards*, 53 F.

Supp. 2d 1236, 1242 (D. Utah. 1999). Specifically, under the PSLRA's "safe harbor provision,"

a defendant is not liable for any statement that is "identified as a forward-looking statement, and

is accompanied by meaningful cautionary statements identifying important factors that could

cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C.

§ 78u-5(c)(1). The statute interprets "forward-looking statement" as

> (A) a statement containing a projection of revenues, income
> (including income loss), earnings (including earnings loss) per
> share, capital expenditures, dividends, capital structure, or other
> financial items;
>
> (B) a statement of the plans and objectives of management for
> future operations, including plans or objectives relating to the
> products or services of the issuer;
>
> (C) a statement of future economic performance, including any
> such statement contained in a discussion and analysis of financial
> condition by the management or in the results of operations
> included pursuant to the rules and regulations of the Commission;
>
> (D) any statement of the assumptions underlying or relating to any
> statement described in subparagraph (A), (B), or (C);

      (E) any report issued by an outside reviewer retained by an issuer,
      to the extent that the report assesses a forward-looking statement
      made by the issuer; or

      (F) a statement containing a projection or estimate of such other
      items as may be specified by rule or regulation of the Commission.

15 U.S.C. § 78u-5(i)(1).  The safe harbor provision does not protect forward-looking statements

that are made with "actual knowledge" that the statement was untrue or misleading.  *Id*. § 78u-

59(c)(1)(B).

      Similar to the statutory safe harbor provision, the judicially created "bespeaks caution

doctrine" holds that "[f]orward-looking representations are . . . considered immaterial when the

defendant has provided the investing public with sufficiently specific risk disclosures or other

cautionary statements concerning the subject matter of the statements at issue to nullify any

potentially misleading effect."  *Grossman*, 120 F.3d at 1120.  Courts recognize the doctrine as

surviving the PSLRA safe harbor provision and thus serving as a separate, independent defense

against securities fraud liability.  *See Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F.

Supp. 2d 662, 676 (D. Colo. 2007).  Under the bespeaks caution doctrine, a risk disclosure is

protected against securities fraud claims if "'the cautionary statements [are] . . . substantive and

tailored to the specific future projects, estimates[,] or opinions . . . which the plaintiffs

challenge.'"  *Grossman*, 120 F.3d at 1119 (quoting *In re Donald Trump Sec. Litigation*, 7 F.3d

357, 371-73 (3d Cir. 1993)) (additional quotations omitted).  Essentially, the doctrine "'is an

application of the common-sense principle that the more a speaker qualifies a statement, the less

people will be misled if the statement turns out to be false.'"  *United States v. Nacchio*, 519 F.3d

1140, 1161 (10th Cir. 2008) (citation omitted).  "At bottom, the . . . doctrine . . . [requires] 'that

18

statements must be analyzed in context' when determining whether or not they are materially misleading." *Grossman*, 120 F.3d at 1120 (quoting *Rubinstein v. Collins*, 20 F.3d 160, 167 (5th Cir. 1994)).

The Tenth Circuit has also refused to recognize as material corporate "puffing" or "generalized statements of optimism that are not capable of objective verification." *Id*. at 1119. "Vague, optimistic statements are not actionable because reasonable investors do not rely on them in making investment decisions." *Id*.

**B.      PSLRA Pleading Requirements**

Federal Rule of Civil Procedure 9(b) requires plaintiffs to state all averments of fraud with particularity. *See* Fed. R. Civ. P. 9(b). The PSLRA further heightens pleading requirements for security fraud claims. *See Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1096 (10th Cir. 2003). Specifically, the PSLRA increases a plaintiff's burden when pleading two elements of a rule 10b-5 action: (1) a material misrepresentation or omission by the defendant and (2) scienter. *See id*.

To adequately plead that the defendant made a material representation or omission, the PSLRA requires a plaintiff to "'specify [in the complaint] each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.'" *Id*. at 1095 (quoting 15 U.S.C. § 78u-4(b)(1)). Where, as here, "the plaintiff['s] complaint refers to the investigation of [plaintiff's] counsel as the basis for [its] allegations, [the court] treat[s] the[] complaint as having been made on information and belief." *Id*. at 1098.

19

In determining whether a plaintiff has satisfied the particularity requirement, the court "evaluat[es] the facts alleged in a complaint to determine whether, taken as a whole, they support a reasonable belief that the defendant's statements identified by the plaintiff were false or misleading." *Id*. at 1099.  Factors relevant to this evaluation are

> (1) the level of detail provided by the facts stated in a complaint;
> (2) the number of facts provided; (3) the coherence and plausibility
> when considered together; (4) whether the source of the plaintiff's
> knowledge about a stated fact is disclosed; (5) the reliability of the
> sources from which the facts were obtained; and (6) any other
> indicia of how strongly the facts support the conclusion that a
> reasonable person would believe that the defendant's statements
> were misleading.

*Id*.  If after evaluating these factors, the court concludes that "a reasonable person would believe that the defendant's statements were false or misleading, the plaintiff has sufficiently pled with particularity facts supporting his belief in the misleading nature of the defendant's statements." *Id*. at 1099.  Although "[r]equiring plaintiffs to state with particularity facts that support a reasonable belief in the misleading nature of a defendant's statements creates a significant hurdle for plaintiffs to overcome before discovery, . . . it permits plaintiffs with valid claims to proceed with their lawsuits." *Id*. at 1100.

To sufficiently plead scienter under the PSLRA, a plaintiff must, "'with respect to each act or omission[,] . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Id*. at 1096  (quoting § 78u-4(b)(2)).  The pleading rule for scienter is "stringent." *Id*.  "[The court] understand[s] a 'strong inference' of scienter to be a conclusion logically based upon particular facts that would convince a reasonable person that the defendant knew a statement was false or misleading." *Id*. at 1105. The Supreme Court has defined scienter as "a mental state embracing intent to deceive,

manipulate, or defraud" and "knowing or intentional conduct." *City of Philadelphia v. Fleming Cos., Inc.*, 264 F.3d 1245, 1258 (10th Cir. 2001) (quotations and citation omitted). Although recklessness can satisfy the scienter requirement, "[c]ourts have been cautious about imposing liabilities for securities fraud based on reckless conduct." *Id*. at 1260. Recklessness is defined as "conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id*. at 1258 (quotations and citation omitted). Negligence, on the other hand, is not a sufficient mental state. *See id*.

Under Tenth Circuit law, "[a]llegations of motive and opportunity . . . are typically not sufficient in themselves to establish a strong inference of scienter," although they may be relevant in reviewing the totality of the pleadings. *Id*. at 1262 (quotations omitted). The Tenth Circuit has also stated that "[g]eneralized imputations of knowledge do not suffice, regardless of defendants' positions within the company." *Id*. at 1264. That is, allegations that individual defendants acted with scienter simply because they "occupied senior positions in [a] company . . . [are] not sufficient." *Id*.; *see also In re Sprint Corp. Securities Litigation*, 323 F. Supp. 2d 1193, 1223-24 (D. Kan. 2002) (explaining that *Fleming* "stands for the proposition that mere allegations that defendants held senior management positions, had access to inside information, and therefore must have known of the falsity of certain statements, is insufficient to plead scienter").

Importantly, the United States Supreme Court recently held that "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Telltabs, Inc. v. Makor Issues & Rights*, Ltd., 127 S. Ct. 2499,

2509 (2007).  This is "an inherently comparative inquiry" that "cannot be decided in a vacuum."  *Id*. at 2510.  Accordingly, "a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff."  *Id*.  In so doing, "the inference of scienter must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations."  *Id*.  This does not mean that "[t]he inference that defendant acted with scienter . . . be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'"  *Id*. (citations omitted).  But, "[a] complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id*.  In making this determination, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically."  *Id*. at 2511.

**C.**      **Lead Plaintiff's Allegations**

With the aforementioned in mind, the court now turns to Lead Plaintiff's claim that Defendants violated federal securities laws in (1) hiding from investors the close resemblance between USANA and an illegal pyramid scheme, (2) misleading investors regarding the long-term sustainability of the company's sales growth and business model, and (3) misleading investors regarding the potential impact of the proposed FTC rule on USANA's future business prospects.  Because the court assesses the allegations as a whole in evaluating scienter, the court examines scienter as a separate subsection of the analysis rather than as part of each individual allegation.  *See id*.

**1.**      **Defendants' Alleged Omission of USANA's Resemblance to an Unlawful Pyramid Scheme**

22

The court first considers whether Defendants had a duty to disclose USANA's alleged resemblance to an unlawful pyramid scheme.  In the Second Amended Complaint, Lead Plaintiff makes no allegation that charges were brought against USANA for operating as an unlawful pyramid scheme.  Thus, acknowledging that Defendants had no duty to disclose uncharged unlawful conduct, *see In re Sofamar Danek Group, Inc.*, 123 F.3d 394, 402 (6th Cir. 1997), Lead Plaintiff argues that when Defendants issued the July 18, 2006, October 17, 2006, and January 10, 2007 press releases attributing USANA's success, in part, to retail demand for product, Defendants placed the topic of its revenue source at issue and therefore had a resulting duty to disclose that the true source of USANA's revenue was, as alleged by Lead Plaintiff, not retail demand but rather the recruitment of new Associates.

In support of this contention, Lead Plaintiff relies on the cases of *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388 (S.D.N.Y. 2005), and *In re Providian Fin. Corp. Sec. Litig.*, 152 F. Supp. 2d 814 (E.D. Pa. 2001).  Both cases involved class action suits by shareholders who alleged that the defendants violated federal securities laws in reporting income to investors that derived, at least in part, from undisclosed illegal business practices.  *See In re Van der Moolen*, 405 F. Supp. 2d 388, 393-94, 400-01 (stating that where defendants put the source of company's revenue at issue, defendants' failure to disclose that true source of revenue was illegal trading was actionable under federal securities laws); *In re Providian*, 152 F. Supp. 2d at 824-25 (holding that plaintiffs adequately stated a 10b-5 claim where they alleged that defendants put the corporation's source of revenue at issue and failed to disclose that true source of revenue was illegal or fraudulent business practices).  In determining that the plaintiffs had sufficiently stated a 10b-5 claim, these two courts stated that although defendants generally have

23

no duty to defame their own business practices or to disclose potential future investigations or litigation, "if [a defendant] puts the topic of the cause of its financial success at issue, then it is 'obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would significantly alter the mix of available information.'" *In re Van der Moolen*, 405 F. Supp. 2d at 400-01 (quoting *In re Providian*, 152 F. Supp. 2d at 824-25).

Unlike the plaintiffs in *In re Van der Moolen* and *In re Providian*, Lead Plaintiff does not allege that the true source of USANA's financial success was unlawful business practices, and the court disagrees with Lead Plaintiff's assertion that Defendants had a duty to disclose Lead Plaintiff's personal opinion that USANA resembled an illegal operation. *See In re Sofamar Danek Group, Inc.*, 123 F.3d 394, 402 (6th Cir. 1997). Nonetheless, the court recognizes the general proposition that "[w]hen a corporation does make a disclosure—whether it [is] voluntary or required—there is a duty to make it complete and accurate." *Roeder v. Alpha Industries, Inc.*, 814 F.2d 22, 26 (1st Cir. 1987). That is, "'[i]f . . . a company chooses to reveal relevant, material information even though it had no duty to do so, it must disclose the whole truth.'" *Id.* (quoting *Grossman v. Waste Management, Inc.,* 589 F.Supp. 395, 409 (N.D. Ill. 1984)) (alteration in original). Accordingly, because, in several cited press releases, Defendants chose to reveal the source of their financial success, they had a duty under the law to ensure that the revelation was complete and accurate. Accepting Lead Plaintiff's allegations as true that Associate recruitment, and not retail demand, was the real source of revenue and that revenues based on consumer demand were exceedingly low compared to revenues from Associate recruitment, the court

concludes that disclosure of such revenue information was necessary to ensure accuracy and completeness.

In short, the court agrees with Defendants that they did not have a duty to disclose USANA's alleged resemblance to an unlawful pyramid scheme. The court, however, does conclude that where Defendants chose to disclose the reasons for USANA's financial success, they had a duty to ensure that those disclosures were accurate and complete. Nonetheless, because, as addressed below, Lead Plaintiff fails to sufficiently plead scienter under PSLRA heightened pleading requirements, the alleged failure of this duty is ultimately irrelevant.

2.      **Defendants' Alleged Misrepresentation of USANA's Long-Term Sustainability**

In the Second Amended Complaint, Lead Plaintiff cites a number of alleged misrepresentations regarding the long-term sustainability of USANA. Specifically, Lead Plaintiff claims that Defendants misrepresented the failure and attrition rates of Associates and the increased difficulties in recruiting new Associates due to market saturation and diminished business opportunity. Lead Plaintiff also maintains that Defendants misrepresented the amount of retail demand for USANA products as well as retail sales projections.

a.      **Sales Projections**

Lead Plaintiff argues that in an October 16, 2007 press release, Defendants made an aggressive sales projection and that this projection was misleading because Defendants knew that the company would not be able to recruit the necessary amount of new Associates due to market saturation and the diminishing attractiveness of USANA business opportunities to

25

prospective Associates.  First, the court notes that the projected retail sales revenues were forward-looking statements that, accompanied by meaningful cautionary statements such as USANA's 2006 SEC disclosures, are protected under the PSLRA's safe harbor provision.  *See Asher v. Baxer Int'l, Inc.*, 377 F.3d 727, 729 (7th Cir. 2004) (concluding that in fraud-on-the-market cases cautionary language contained in SEC disclosures will bring allegedly misleading press releases under PSLRA safe harbor provision even if the cautionary language does not accompany the press release).  Second, to the extent that Lead Plaintiff claims the projections were made with actual knowledge that the revenue estimates were untrue or misleading, Lead Plaintiff fails, as explained below, to sufficiently plead scienter.

### b.    Associate Failure and Attrition Rates

Regarding the failure and attrition rates of Associates, Lead Plaintiff asserts that the following statements constituted misrepresentations:  Defendants' statement on its website that the "average income for North American Associates in 2005 was $802.62"; USANA's July 18, 2006 press release stating that the primary reason for the company's 2006 sales growth was the "consistent growth of active Associates" and the "business opportunity that USANA offers its Associates"; and USANA's statement in its 2006 Form 10-K that the company "ended 2006 with 153,000 active Associates, an increase of 15% from 133,000 Associates at the end of 2005." Lead Plaintiff also claims that during a July 19, 2006 conference call with securities analysts, Defendants evaded giving a specific answer to an analyst's question about USANA's Associate retention rate and instead provided false reassurances.

Lead Plaintiff claims that the above statements were misleading because the Fraud

Discovery Institute's report reveals that 74% of Associates were failing within the first year, more than 87% of Associates were losing money, only the top 2.6% of Associates received 72.2% of all commissions paid by USANA, 66% of USANA's North American Associates received no commission, and USANA suffered from almost complete turnover of Associates each year.  Lead Plaintiff also states that USANA's reported average salary for 2005 excluded from its calculation the thousands of unsuccessful Associates who became inactive before the end of the year.

The court first determines that any alleged misrepresentations regarding Associate failure and attrition rates are immaterial, and thus not actionable, under the bespeaks caution doctrine because USANA's SEC disclosures during the class period nullified any potentially misleading effect.  USANA's 2006 10-K specifically denoted that "[t]o increase revenue, [the company] must increase the number and/or productivity of . . . Associates";  USANA's "future growth in sales volume will depend in large part upon [the company's] success in increasing the number of new Associates and improving the productivity of Associates"; "[t]here is typically significant turnover in Associates from year to year" forcing the company to "continually recruit new Associates"; the company "provide[s] no assurances that the number of Associates will increase or remain constant, or that their productivity will increase"; "[t]he number of active Associates may not increase and could decline in the future"; "[o]perating results could be adversely affected if [the company's] existing and new business opportunities and products do not generate sufficient economic incentive or interest to retain existing Associates and to attract new Associates"; "[t]here can be no assurance that [the company's] programs for recruiting and retaining Associates will be successful"; and the company "cannot accurately predict any

27

fluctuation in the number and productivity of Associates."

Second, even if the statements are material, Lead Plaintiff has failed to satisfy PSLRA pleading requirements.  Although Lead Plaintiff specifies the statements that were misleading and the reasons why these statements were misleading, Lead Plaintiff does not comply with the particularity pleading requirement.  For instance, regarding the average Associate salary, Lead Plaintiff does not disclose its source for its allegation that in USANA's 2005 Associate salary calculation the company excluded thousands of unsuccessful Associates who became inactive before the end of the year.  Although the disclosure of sources is not a per se requirement under Tenth Circuit law, the facts alleged to support the alleged salary misrepresentation are not "particularly detailed," or "numerous" and appear to the court as nothing more than a conclusory allegation.  *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1103 (10th Cir. 2003).  Likewise, Lead Plaintiff's allegation regarding Defendants' supposed avoidance of a question about Associate retention rates is not supported in the Second Amended complaint by detailed, numerous, or coherent facts.  Indeed, the quotation by David Wentz cited in the Second Amended Complaint simply states that retention rates have not substantially changed over the last fourteen years—a fact that Lead Plaintiff does not dispute.  As for the other statements, Lead Plaintiff has not sufficiently shown that these statements were misleading where, as here, the reasons Lead Plaintiff proffers as to why they were misleading do not contradict the accuracy or completeness of the statements themselves.

c.      **Market Saturation**

Lead Plaintiff alleges that in an October 18, 2006 conference call to securities analysts,

Fuller, in response to a question about market saturation, stated that USANA did not feel like the market was saturated.  Lead Plaintiff claims that this statement was misleading because, as reported by a confidential witness who worked as a USANA distributor and customer service representative, many areas in which USANA operated were saturated.

First, it is questionable whether Fuller's statement is material.  It is uncertain if any reasonable investors would have relied on Fuller's declaration of USANA's feelings about the market.  Also, the 2006 10-K stated that USANA's "business is subject to the risk associated with intense competition from larger, wealthier, and more established competitors."  The 10-K noted that it cannot guarantee its ability to remain competitive due to the intensity of the competition, the "wide variety of channels of distribution" for nutrition and personal care products available to consumers, and USANA's "relatively small" product offerings compared to competitors.

Second, Lead Plaintiff fails to satisfy the PSLRA particularity requirement.  The statistics cited in the Second Amended complaint showing that USANA's competitors were experiencing growth does not necessarily mean that USANA's growth was slowing down.  And the statement by a confidential witness that the market was saturated is so lacking in specificity and reliability as to render the statement nothing more than a generic conclusion.

### d.      Demand for USANA Products

Lead Plaintiff maintains that any statement by Defendants attributing USANA's sales growth to significant consumer demand for products was misleading because, according to a confidential witness who worked for USANA, Associates could "rarely" make retail sales

because the company's prices for products were too high and not competitive.  Lead Plaintiff

also points to a statement by a confidential witness who worked at a local USANA call station

that he or she heard from Associates on a daily basis that consumers were not interested in

USANA products because they were overpriced.

Again, Lead Plaintiff has failed to demonstrate in the Second Amended Complaint that

these statements are material and misleading.  The 2006 10-K disclosed that the company

"rel[ies] on . . . Associates to purchase, market, and sell [its] products"; that "Associates . . .

purchase products directly for their own use or for resale"; that "[e]ach Associate is required to

purchase a certain amount of product each month . . . which they must either resell to consumers

or personally use"; and that "net sales are directly dependent upon the efforts of . . . Associates."

 And the court determines that the Second Amended Complaint's sole reliance on a conclusory

statement, notably based on hearsay, of a confidential witness is insufficient to satisfy the

PSLRA particularity requirement.

### 3.    Defendants' Alleged Misrepresentation of Proposed FTC Rule

In her Second Amended Complaint, Lead Plaintiff alleges that Defendants

misrepresented the potential impact of the proposed FTC rule on USANA's future business

prospects when David Wentz stated to investors on July 19, 2006, that USANA was "confident"

that the proposed rule would not be something "that disrupts business very much."  Lead

Plaintiff argues that this representation was misleading because, as acknowledged by David

Wentz in a June 30, 2006 lobbying letter to the FTC and in a July 17, 2006 representation by the

DSA, the proposed rule would require USANA to change its recruiting practices, would hinder

USANA's ability to attract new Associates, and would significantly impair USANA's ability to sustain growth.

First, all the above cited statements are forward looking representations accompanied by cautionary language in USANA's Q2 2006 Form 10-Q that the proposed rule "might require USANA to change some of its current practices."  Defendants' use of the term "might" suggests uncertainty and the possibility of correction and refinement.

Second, the Second Amended Complaint does not sufficiently allege a misrepresentation.  Lead Plaintiff appears to assume that the statements are misleading simply because they are contradictory.  If the court were to allow such generalized assumptions to satisfy particularity requirements, the court would effectively eliminate the "heightened" aspect of the PSLRA pleading standards.  A divergence in company opinion as to the proposed FTC rule could reflect a variety of events and circumstances occurring during the interim period between statements.

 Furthermore, even assuming Defendants' statements about the proposed rule constituted material misrepresentations, the Second Amended Complaint does not allege any economic loss or loss causation as a result of these misrepresentations, and the Supreme Court has made clear that an allegation that an investor paid artificially inflated security prices is insufficient in itself to satisfy the loss causation element of a 10b-5 claim.  *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345-46 (2005).

### 4.        Scienter

Lead Plaintiff contends that it has adequately pleaded scienter based on a confidential witness's description of Defendants' receipt and review of internal reports discussing attrition

rates, Defendants' "invariabl[e]" discussion of these reports at meetings, and the decision by

Defendants, particularly Myron Wentz, to sell shares when USANA stock were selling for high

prices.  The court concludes that these allegations do not, taken as a whole, give rise to a strong

inference of scienter.

First, except for perhaps Myron Wentz's sale of shares, Lead Plaintiff does not specify

facts strongly indicative of scienter "with respect to *each* act or omission."  *Adams v. Kinder-*

*Morgan, Inc.*, 340 F.3d 1083, 1095-96 (10th Cir. 2003) (emphasis added).  Lead Plaintiff's

assertions of scienter based on Defendants' receipt and purported review—an inference Lead

Plaintiff draws from Defendants' senior positions in the company—of internal company reports

discussing USANA's attrition rate do not pertain to *every* alleged omission or misrepresentation.

 Second, even assuming that Defendants read the internal reports, Lead Plaintiff fails to allege

any facts suggesting that these reports contained specific information regarding Associate

attrition rates that would have led Defendants to believe that not disclosing the attrition rates was

false or misleading.  *See Fleming*, 264 F.3d at 1264 ("[T]he important issue is not whether

Defendants knew the underlying facts, but whether Defendants knew that not disclosing [those

facts] posed substantial likelihood of misleading investors."); s*ee also Adams*, 340 F.3d at 1105

("[The court] understand[s] a 'strong inference' of scienter to be a conclusion logically based

upon particular facts that would convince a reasonable person that the defendant knew a

statement was false or misleading.").  Third, concerning any alleged discussion of the attrition

rates that supposedly occurred, Lead Plaintiff alleges that only Defendant Fuller attended these

meetings and that attrition rates in general were discussed.  *See Fleming*, 264 F.3d at 1262

(stating that "generalized imputations of knowledge do not suffice" to establish scienter

"regardless of defendants' positions within the company").  Fourth, Lead Plaintiff's reliance on

Defendants', especially Myron Wentz's, sales of shares is, standing alone, insufficient to show

scienter.  *See id.* at 1262 ("Allegations of motive and opportunity . . . are typically not sufficient

in themselves to establish a strong inference of scienter."); *see also In re Quest Communications*

*Int'l, Inc.*, 396 F. Supp. 2d 1178, 1194 (D. Colo. 2004) ("Courts should not infer fraudulent

intent based only on the fact that some officers sold stock.").

    In sum, there are simply no alleged facts in the Second Amended Complaint strongly

suggestive of "intent to deceive, manipulate, or defraud."  *Id.* at 1259.  Nor has Lead Plaintiff

alleged facts that strongly insinuate conduct constituting "an extreme departure from the

standards of ordinary care."  The court concludes that while "the inference of scienter [in this

case could perhaps be] . . . reasonable or permissible . . . [it is not] cogent and compelling."

*Telltabs, Inc. v. Makor Issues & Rights*, Ltd., 127 S. Ct. 2499, 2509 (2007) (quotations omitted).


### CONCLUSION

    The court concludes that in failing to assert actionable federal securities law claims and

to satisfy the PSLRA's heightened pleading requirements, Lead Plaintiff has failed in her Second

Amended Complaint to "'nudge [her] claims across the line from conceivable to plausible.'"

*Robbins v. Oklahoma,* 519 F.3d 1242, 1247 (10th Cir. 2008) (quotations omitted).

    Accordingly, the court GRANTS Defendants' Motion to Dismiss with prejudice.[5]

    DATED this 23rd day of July, 2008.

---

[5] Lead Plaintiff indicated at oral argument that she was not interested in further amendments to
the Second Amended Complaint.

BY THE COURT:

_____
DALE A. KIMBALL

United States District Judge